UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

REBECCA DILORENZO,

               Plaintiff,

     v.

COSTCO WHOLESALE CORPORATION,

               Defendant.

CASE NO. C06-0727-JCC

ORDER

     This matter comes before the Court on Defendant's Motion for Summary Judgment (Dkt. No. 41-1), Plaintiff's Response (Dkt. No. 46-1), and Defendant's Reply (Dkt. No. 50-1). Having considered the papers submitted by the parties and determined that oral argument is unnecessary, the Court hereby finds and rules as follows.

## I.     BACKGROUND

     Plaintiff alleges that she is a disabled individual who suffers from a variety of ailments arising after her service in the armed forces. With the support of her treating psychologist, Plaintiff began to employ the assistance of a dog, who Plaintiff asserts is "a service animal trained to assist her in resisting and responding to the difficulties raised by her conditions." (Am. Compl. ¶¶ 2.1–2.2 (Dkt. No. 23).) Plaintiff acquired the dog, a pug named Dilo, in approximately March 2004, when it was an untrained eight month-old puppy. (Pl.'s Dep. 65:18–24 (Dkt. No. 41-2).) Plaintiff's claims arise from interactions with

ORDER – 1

Costco store employees on two separate shopping trips with Dilo in her company. First, on or around April 30, 2004, Plaintiff entered Defendant's Bellingham warehouse and informed an employee at the entrance that Plaintiff was accompanied by an animal that was in the process of being trained as a "service animal." (Am. Compl. ¶ 2.16 (Dkt. No. 23).) At that time Dilo was about twelve weeks old and was not wearing any accessory indicating he was a service animal. (Pl.'s Dep. 92:13 (Dkt. No. 41-2).) Plaintiff was asked to proceed to a podium where she was given copies of Costco's Service Animal Policy and a Department of Justice Business Brief on service animals. (Def.'s Mot. 2 (Dkt. No. 41-1).) Plaintiff showed an employee at the podium a copy of a letter from her psychologist, which briefly described her disabilities and attested to Plaintiff's suitability for owning a service animal. (Perini Letter (Dkt. No. 41-3).) Plaintiff did not leave a copy of the letter or any other information about herself for future reference, nor did the employee ask her to do so. (Def.'s Mot. 2–3 (Dkt. No. 41-1).)

On a second visit to the Bellingham warehouse on July 3, 2004, Dilo was wearing a vest that read "service dog in training." (Am. Compl. 2.18 (Dkt. No. 23).) Defendant's employee described the vest as being, at least in part, "homemade." (Adele Wolcott Dep. 3:7–15 (Dkt. No. 46-2).) Plaintiff, her husband and Dilo entered the warehouse unmolested and while shopping in the meat section, Plaintiff began to carry Dilo in her arms to avoid injury to the dog from the crowd of shopping carts. (Pl.'s Dep. 111:4–14 (Dkt. No. 41-2).) Prior to reaching the cash registers, Plaintiff was approached by store manager Adele Wolcott, who asked Plaintiff on whose behalf the dog acted as a service animal, as well as what task it performed. Plaintiff responded that Dilo was hers and that he "alert[ed] [her] to – for spells." *Id.* at 112:1–5. Ms. Wolcott then walked away and Plaintiff proceeded through the check-out line. While approaching the warehouse exit, Plaintiff and her party were confronted by Ms. Wolcott and Ken Burnham, another manager, who asked to speak with her. *Id.* at 114:19–22. According to Plaintiff, Ms. Wolcott said she believed the dog belonged to Plaintiff's husband, apparently because he had brought Dilo into the warehouse on a previous occasion. Ms. Wolcott also asserted that the dog's vest was not

ORDER – 2

1

2  "regulation." *Id.* at 116:12–13; 117:16–19. Finally, Ms. Wolcott objected to the fact that Plaintiff had

3  carried the dog around the warehouse. The tone of this interaction, according to Plaintiff, was not "nice,"

4  but rather "inappropriate . . . loud . . . embarrassing . . . humiliating . . . degrading." *Id.* at 118:2–5. At

5  that point, Burnham informed Plaintiff that companion animals were not allowed in the warehouse and

6  that in the future Plaintiff could "sit in [her] car with [her] dog." *Id.* at 118:18–20. Plaintiff asserts that

7  Defendant's employees' actions constituted harassment, as they were, in her words, accusing her of being

8  a "liar." *Id.* at 213:9–11. Plaintiff also claims that the encounter may have created the false impression for

9  passers-by, some of whom may have been acquaintances, that she was suspected of shoplifting. *Id.*

10  218:1–7. Feeling uncomfortable, Plaintiff took note of Ms. Wolcott and Mr. Burnham's contact

11  information and left the warehouse.

12      According to the parties, each made subsequent attempts to contact the other to follow up on the

13  July 3, 2004 incident. Plaintiff claims she left several messages with Costco employees which were never

14  returned. *Id.* at 125:12–13. Defendant's lawyer sent, and Plaintiff did receive, a letter asking her to

15  provide further information about her dog's training and the tasks it performs (Kaplan Letter (Dkt. No.

16  41-3).) The purpose of the letter was to "determine whether the dog was a *bona fide* service animal."

17  (Def.'s Mot. 4 (Dkt. No. 41-1).)  Plaintiff never responded to this letter and claims that it constituted

18  further harassment. (Pl.'s Dep. 140:23 (Dkt. No. 41-2).)

19      Finally, from the available record, it appears that Costco may have deviated from its policies

20  regarding service animals at the time. Plaintiff asserts, and Defendant does not clearly refute, that the

21  relevant policy stated that service animals visually identifiable as such would not be subject to further

22  scrutiny. Furthermore, no distinction was drawn between service animals and service animals in-training.

23  (Pl.'s Resp. 4 (Dkt. No. 46-1).) The foregoing set of events is the basis upon which Plaintiff brings her

24  claims under state and federal law, each of which the Court addresses below in turn.

25

26  ORDER – 3

## II.   DISCUSSION

### A.   Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). There is no genuine issue for trial unless there is sufficient evidence to support a jury verdict in favor of the nonmoving party. *Anderson*, 477 U.S. at 250. The moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Id.* at 257. Furthermore, the Court must draw all reasonable inferences in favor of the nonmoving party. *See F.D.I.C. v. O'Melveny & Myers*, 969 F.2d 744, 747 (9th Cir. 1992), *rev'd on other grounds*, 512 U.S. 79 (1994).

In addition to demonstrating that there are no questions of material fact, the moving party must also show that it is entitled to judgment as a matter of law. *Smith v. Univ. of Washington Law School*, 233 F.3d 1188, 1193 (9th Cir. 2000). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim for which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### B.   Americans with Disabilities Act ("ADA") Claim

Plaintiff's second cause of action alleges that Defendant failed to comply with its obligations as a public accommodation under the ADA. Title III of the ADA states that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . ." 42 U.S.C. §12182(a). The statute further instructs the Attorney General to issue regulations implementing the non-transportation provisions of the ADA. 42 U.S.C. §12186(b). Accordingly, the Department of Justice ("DOJ") regulations state that:

ORDER – 4

> A public accommodation shall make reasonable modifications in policies, practices, or procedures, when the modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the public accommodation can demonstrate that making the modifications would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations.

28 C.F.R. §36.302(a). With regard to service animals in particular, the regulations state: "Generally, a public accommodation shall modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability." *Id*. at §36.302(c)(1). Furthermore, a "service animal" is defined as:

> [a]ny guide dog, signal dog, or other animal individually trained to do work or perform tasks for the benefit of an individual with a disability, including, but not limited to, guiding individuals with impaired vision, alerting individuals with impaired hearing to intruders or sounds, providing minimal protection or rescue work, pulling a wheelchair, or fetching dropped items.

*Id*. at §36.104. Furthermore, as the "agency directed by Congress to issue implementing regulations, to render technical assistance, and to enforce Title III in court, the Department's views are entitled to deference." *Bragdon v. Abbott*, 524 U.S. 624, 646 (1998) (internal citations omitted).

In her second cause of action, Plaintiff asserts that Defendant discriminated against her in violation of the ADA by failing or refusing "to modify its policies, practices and procedures when such modifications were necessary" to allow her access to its goods, services, facilities, privileges, advantages, and accommodations. Such modification she asserts, should have included making allowance for her service animal, which helped her cope with the consequences of her disability. (Am. Compl. ¶¶ 2.37–2.39 (Dkt. No. 23).) Defendant responds by asserting that Plaintiff's dog was not a service animal under the governing regulations at the time in question, and that in any case, Plaintiff refused to respond to a reasonable inquiry which would have allowed Costco to determine the dog's qualifications. (Def. Mot. 6–10 (Dkt. No. 41-1).)

It is not entirely clear what specific acts or omissions by Defendant form the basis of Plaintiff's ADA claim. The Amended Complaint cites the statutory language regarding the obligation of a public

ORDER – 5

accommodation to make "reasonable modifications" to its polices, but does not describe what Defendant specifically did or failed to do. (*See* Am. Compl. ¶¶ 2.37–2.39 (Dkt. No. 23).) The modification sought cannot be to have allowed entry into the warehouse with her dog, because she was admitted on every occasion in question. In her deposition testimony, Plaintiff states that the conduct she deemed illegal was the "harassment" of being questioned about her dog on July 3, 2004. (Pl.'s Dep. 123:1–18 (Dkt. No. 41-2).) While this may not serve as the operative legal statement of her claim, her response brief does little to clarify the matter, as it simply quotes provisions of the ADA without any discussion of how they apply to the facts of this case. Under these circumstances, the Court interprets Plaintiff's ADA claim as challenging the legitimacy of the inquiry about her dog's qualifications, in so far as it may have impeded her "full and equal enjoyment" of Defendant's facilities. 42 U.S.C. §12182(a). Since Defendant indicated in its letter that Plaintiff would need to respond to further questioning before being admitted with her dog in the future, the analysis necessarily includes the legitimacy of this further inquiry subsequent to the July 3, 2004 encounter.[1]

Once Plaintiff's claim is understood in this way, there are two issues raised by the parties that confuse the question before the Court. First, Plaintiff's emphasis on Costco's service animal policy is misplaced for the purposes of the ADA analysis. That is, the question of Costco's compliance with its own policy does not obviate the fundamental inquiry into whether its actions violated the statute. Whether a given policy sets forth standards of conduct within statutory bounds is a question of facial validity, which in the case of Costco's service dog policy, was upheld in *Grill v. Costco Wholesale Corp.*, 312 F. Supp. 2d 1349 (W.D. Wash. 2004). The existence of a legal policy notwithstanding, a public

---

[1]In its Reply brief, Defendant points to the ambiguity of Plaintiff's position and asserts that the focus upon unreasonable questioning in her response constitutes a "subtl[e] shift." Based upon the brief recitation of ADA statutory provisions in the Amended Complaint, it is unclear from what starting point Plaintiff could have shifted. For the reasons stated above, the Court believes Plaintiff's claim is best understood as challenging the inquiry rather than an exclusion that never occurred.

ORDER – 6

accommodation can still act in a manner that violates the ADA, which is precisely the question raised in this case. Either way, Costco does not violate the ADA simply by violating its own policy.

Second, Defendant's emphasis on Dilo's lack of qualifications as a service dog at the time in question does not address the entire issue. That is because a violation of the statute can occur by virtue of the manner by which an inquiry is conducted. As discussed in *Grill*, cited by Defendant, the DOJ has issued guidance as to what constitutes a legitimate inquiry as to a particular animal's qualifications. *See Grill*, 312 F. Supp. 2d at 1352. It appears that Costco employees were aware of such limitations based on Ms. Wolcott's deposition testimony, in which she stated that "[w]e cannot ask their disability, but Costco does have the right to ask them what function the animal does perform." (Adele Wolcott Dep. 42:20–22 (Dkt. No. 46-2).) Thus, Defendant does not defeat Plaintiff's ADA claim by simply showing that Dilo was not a bona fide service animal at the time of the inquiry,[2] since the manner in which it went about verifying such a fact could have violated the law.

Plaintiff's ADA claim ultimately depends on whether Defendant exceeded the parameters of a legitimate inquiry in confronting Plaintiff about her dog. That Costco had a right to make an inquiry in the first place cannot seriously be questioned. This follows from DOJ interpretations regarding "legitimate inquiry," the *Grill* case, as well as common sense. In operating its business, Costco has the authority to exclude ordinary pets from its facilities, and yet must also comply with federal anti-discrimination law, which under most circumstances includes permitting service animals into its warehouses. Given these two co-existing conditions, an occasion for some kind of inquiry is bound to arise. In *Grill*, the court

---

[2]It appears highly questionable whether Dilo was a "service animal" as of the July shopping trip. Plaintiff states that she got Dilo in March 2004 and the task he performs is he "alerts [her] for panic attacks and anxiety attacks." (Pl.'s Dep. 74:17–18 (Dkt. No. 41-2).) Elsewhere in her deposition however, Plaintiff acknowledges that it took six to seven months before the dog was able to recognize and alert her for a panic attack on its own. (*Id.* at 70:23–25; 71:1–2.) Therefore, as of July 3, 2004, the dog arguably was not "individually trained to do work or perform tasks for the benefit of an individual with a disability." 28 C.F.R. §36.104.

ORDER – 7

examined the limitations on inquiry about service animal's qualifications, citing a DOJ business brief providing that a "[b]usiness may ask if an animal is a service animal or ask what tasks the animal has been trained to perform, but cannot require special ID cards for the animal or ask about the person's disability." *Grill*, 312 F. Supp. 2d at 1352. This is referred to as a "task or function" inquiry and is the key method for distinguishing a service dog from a pet.

Based upon this standard, Defendant's employees did not exceed the boundaries of a permissible inquiry by their conduct on July 3, 2004. They never asked Plaintiff to state her disability, nor did they demand proof of special training. In the encounter prior to Plaintiff entering the checkout line, Ms. Wolcott made a standard "task or function" inquiry by asking whose dog it was and what task it performed. (Pl.'s Dep. 112:1–5 (Dkt. No. 41-2).) As for the content of the subsequent letter sent by Costco's attorney, it too posed standard "task or function" questions by asking who the dog was trained to assist, and what training it had received. (Kaplan Letter (Dkt. No. 41-3).) The letter also asked whether the dog was a "seizure alert dog" or a "comfort dog." *Id*. While it is not clear why these were the only available options, presumably Plaintiff could have responded that her dog was neither and it would not have disqualified Dilo as a service animal.

The fact, in and of itself, that Defendant made a second "task or function" inquiry by letter, and that Plaintiff's future admittance was apparently conditioned upon her answers is a separate question. Clearly an inquiry would cease to be legitimate if it was used to harass or discourage people with disabilities from availing themselves of public accommodation. In this way, unduly repetitive questioning, after an adequate answer has been given, could suggest a pretext for discrimination, constituting an illegitimate inquiry. However, a similar course of action to what Defendant took here has been recognized as legitimate in the housing context. In *Prindable v. Ass'n of Apartment Owners*, the court concluded that:

In any event, there is no evidence that Defendants ever denied Plaintiffs' request for a

1

2      service animal. Beginning with their response to Dr. Kalauawa's May 17, 2000 letter, the
AOAO merely requested additional, appropriate information from Prindable and his

3      treating physicians.

4  304 F. Supp. 2d 1245, 1260 (D. Haw. 2003). The Court finds this reasoning analogous to the present

5  case.

6          Furthermore, in evaluating Defendant's conduct here, other facts surrounding the encounter

7  cannot be ignored. The following factors, which Plaintiff has either explicitly acknowledged or not

8  disputed, clearly raised legitimate suspicions about whether Dilo was indeed a service animal: (1) The

9  first time Plaintiff brought her dog into the warehouse as a "service dog in training," it was an untrained

10  twelve week-old puppy ( Pl.'s Dep. 92:11–13 (Dkt. No. 41-2)); (2) Plaintiff's husband appears to have

11  brought Dilo into the warehouse on at least one occasion prior to July 3, 2004, claiming that it served as

12  a "comfort animal" to him (Kaplan Letter (Dkt. No. 41-3)); (3) Plaintiff carried Dilo in her arms for an

13  extended period of time while shopping on July 3, 2004 (Pl.'s Dep. 111:4–14 (Dkt. No. 41-2)); and (4)

14  As of the date in question, Dilo was unable to independently perform his task (as a service animal) of

15  alerting for panic attacks without prompting from Plaintiff's husband. (Pl.'s Dep. 69:21–23 (Dkt. No. 41-

16  2).) While Defendant's employees did not know this latter fact at the time, it is safe to say they could not

17  witness the dog performing any task to assist Plaintiff with her disability. Under these circumstances, it

18  was not unreasonable or illegitimate for Defendant to have expressed doubts about Dilo's status, or to

19  have sent a follow-up letter seeking further clarification. Had Plaintiff responded by affirming that the dog

20  was her service animal and that it was individually trained to alert her for panic and anxiety attacks, it is

21  not clear on what basis Defendant could object in the future. As this did not occur, however, the Court

22  concludes that Costco's actions did not exceed the boundaries of a legitimate inquiry under the ADA, and

23  thus Defendant is entitled to judgment as a matter of law on this claim.

24

25      **C.**    **Washington Law Against Discrimination ("WLAD") claim**

26  ORDER – 9

1

2          Similar to the anti-discrimination scheme of the ADA, Washington law protects "[t]he right to the

3    full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public

4    resort, accommodation, assemblage, or amusement." WASH. REV. CODE. §49.60.030(1)(b). Denial of

5    "full enjoyment" under the statute includes causing someone to be "treated as not welcome, accepted,

6    desired, or solicited. *Id.* at §49.60.040(9).  Furthermore, the law prohibits acts which "directly or

7    indirectly result in . . . the refusing or withholding from any person the admission, patronage, custom,

8    presence, frequenting, dwelling, staying, or lodging in any place of public resort, accommodation,

9    assemblage, or amusement." *Id.* at §49.60.215. These protections explicitly extend to "the use of a

10   trained dog guide or service animal by a person with a disability." *Id.* A service animal is defined as "an

11   animal trained for the purpose of assisting or accommodating a person's sensory, mental, or physical

12   disability." WASH. ADMIN. CODE §162.26.040(2). Washington state courts have recognized that disability

13   discrimination under state law "substantially parallels federal law" on the subject, and therefore have

14   indicated that "courts should look to interpretations of federal anti-discrimination laws, including the

15   ADA, when applying the WLAD." *Grill v. Costco Wholesale Corp.*, 312 F. Supp. 2d 1349, 1354 (W.D.

16   Wash. 2004) (citing *Matthews v. NCAA*, 179 F. Supp. 2d 1209, 1229 (E.D. Wash. 2001).)

17          The circumstances under which the Court finds that Plaintiff's ADA claim fails, are equally

18   applicable to her WLAD claim. Plaintiff presents no authority for the proposition that a different analysis

19   governs her state law discrimination claim, such that Defendant would be subject to a different legal

20   standard than that which obtains under the ADA for inquiring about a service animal. Having determined

21   that Defendant did not exclude Plaintiff and her dog from their warehouse, and that it conducted a

22   legitimate inquiry under the ADA as to whether the dog functioned as a service animal in light of

23   circumstances that suggested otherwise, Plaintiff's WLAD claim presents no genuine issue of material

24   fact and fails as a matter of law.

25

26   ORDER – 10

1

2     **D.     Negligent Infliction of Emotional Distress ("NIED") claim**

3          Plaintiff brings a tort claim of NIED as a result of her interactions with Costco employees on her

4     shopping trips to Defendant's Bellingham warehouse. In Washington, the tort of NIED requires a

5     showing that (1) The defendant owed a duty of care to plaintiff, (2) Defendant breached that duty, (3)

6     There was proximate cause between breach and damages, and (4) Damages did indeed inhere. *Hunsley v.*

7     *Giard*, 553 P.2d 1096, 1102 (Wash. 1976). In *Hunsley*, the state supreme court made clear that in

8     applying this test, "[n]ot every act which causes harm results in legal liability," since "[o]ur experience

9     tells us that mental distress is a fact of life." *Id.* at 1102–03. Accordingly, a defendant's "obligation to

10    refrain from particular conduct is owed only to those who are foreseeably endangered by the conduct and

11    only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous."

12    *Id.* at 1103.

13         "Under traditional negligence principles, whether a particular class of defendants owes a duty to a

14    particular class of plaintiffs is a question of law and depends on mixed considerations of 'logic, common

15    sense, justice, policy, and precedent.'" *Keates v. Vancouver*, 869 P.2d 88, 92 (Wash. Ct. App. 1994)

16    (quoting *Hartley v. State*, 698 P.2d 77, 83 (Wash. 1985)). "In deciding whether a duty is owed the

17    primary consideration is whether the conduct in question is unreasonably dangerous." *Id.* at 93 (citing

18    *Corrigal v. Ball & Dodd Funeral Home, Inc.*, 577 P.2d 580 (Wash. 1978)). "Unless the defendant's

19    conduct is unreasonably dangerous, the defendant owes no duty." *Id.* (citing *Hunsley*, 553 P.2d at 1103).

20    "Conduct is unreasonably dangerous when the risks of harm outweigh the utility of the activity." *Wells v.*

21    *Vancouver*, 467 P.2d 292, 298 (Wash. 1970) (quoting *Raymond v. Paradise Unified School Dist.*, 218

22    Cal.App.2d 1 (Dist.Ct.App.1963)).

23         Plaintiff's claim for NIED requires consideration of her two shopping trips in tandem. In

24

25

26    ORDER – 11

1

2 amending the Complaint to comply with this Court's August 9, 2006 Order (Dkt. No. 14),[3] Plaintiff

3 clarified her theory that the April trip to Defendant's Bellingham warehouse, in which she furnished the

4 letter from her psychologist, effectively put Defendant on notice that a "high likelihood [of] risk of injury

5 would accompany any unnecessary attention to plaintiff and plaintiff's animal, and that additional public

6 attention which might result from Defendant's public questioning would be unreasonably dangerous and

7 would subject her to injury and damage." (Am. Compl. ¶ 2.32 (Dkt. No. 23).) Essentially, Plaintiff claims

8 that this letter made Defendant's subsequent conduct on her July visit to the warehouse "unreasonably

9 dangerous," and therefore constituted a breach of duty. Defendant takes issue with Plaintiff's failure to

10 leave a copy of her psychologist's letter, and furthermore asserts that "the text of the letter does not

11 suggest anything about a heightened risk of injury to Plaintiff if Costco takes (or fails to take) any action

12 with respect to Plaintiff." (Def.'s Mot. 10–11 (Dkt. No. 41-1).)

13       The Court need not address whose obligation it was to give or retain a copy of the letter in April

14 2004, since even if Defendant was chargeable with its contents, the letter failed to indicate a "high

15 likelihood of risk" attached to future questioning making such conduct "unreasonably dangerous." The

16 letter from Plaintiff's psychologist is not nearly as enlightening as her amended complaint and response

17 brief suggest. The letter explains that Plaintiff has been diagnosed with "Posttraumatic Stress Disorder

18 and Major Depression," and states that she "would be a good candidate and responsible recipient for

19 service dog ownership." (John Perini Letter (Dkt. No. 41-3).) Furthermore, it implies that she needs to

20 feel "enhanced personal safety" and "unconditional love and devotion." *Id.* Contrary to Plaintiff's

21 assertion in the Amended Complaint, the letter does not say anything about "panic disorder." More

22

23

24      [3]The Court previously dismissed Plaintiff's NIED claim without prejudice for failure to state a claim. In so doing, the Court also instructed that Plaintiff could cure the failure to plead a duty owed by asserting that "Plaintiff had indeed warned Defendant of her particular frailties and [that] these frailties

25 were of a nature that would render Defendant's questioning of her 'unreasonably dangerous. . .'"

26 ORDER – 12

1

2   importantly, the general description of Plaintiff's ailments could not reasonably instruct a lay person that

3   an ordinarily unobjectionable course of conduct, an inquiry made in public space, would be "unreasonably

4   dangerous" with regard to Plaintiff.[4] The Court need not doubt the veracity of Plaintiff's suffering to find

5   that it would have taken more to put Defendant's employees on notice that ordinary conduct would cause

6   extraordinary emotional harm to Plaintiff. Accordingly, this falls into the category of an act which caused

7   harm without resulting in liability, and therefore Plaintiff's NIED claim fails as a matter of law.

8            **E.        Intentional Infliction of Emotional Distress/Outrage claim**

9            Plaintiff also brings a claim of outrage as a consequence of her treatment by Defendant. To

10  establish a claim for the tort of outrage, a plaintiff must show "(1) extreme and outrageous conduct, (2)

11  intentional or reckless infliction of emotional distress, and (3) severe emotional distress on the part of the

12  plaintiff." *Reid v. Pierce County*, 961 P.2d 333, 337 (Wash. 1998). Regarding the standard for "extreme

13  and outrageous conduct," the Washington Supreme Court has held that "the conduct in question must be

14  'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency,

15  and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Dicomes v.*

16  *Washington*, 782 P.2d 1002, 1012 (Wash. 1989) (citing *Grimsby v. Samson*, 530 P.2d 291, 295 (1975)

17  (emphasis omitted)). "While the question of outrageousness is normally one for the jury to decide, it is for

18  the court to make the initial determination of whether 'reasonable minds could differ on whether the

19  conduct was sufficiently extreme to result in liability.'" *Bryant v. Country Life Ins. Co.*, 414 F. Supp. 2d

20  981, 1004 (W.D. Wash. 2006) (quoting *Grimsby*, 530 P.2d at 295). "Conduct which is merely insulting

21  or annoying, or even threatening will not trigger liability." *Bryant*, 414 F. Supp. 2d at 1004.

22           Similar to her claim of NIED, Plaintiff bases her outrage claim upon the entire course of

23

---

24           [4]Nor does the fact that Costco may have deviated from its service animal policy render its
    questioning an "unreasonably dangerous" act. Requiring Plaintiff to enter an unexpected conversation

25  hardly bespeaks the kind of peril that would invoke a duty here.

26  ORDER – 13

Defendant's conduct, in light of having presented her letter to Defendant's employees on her April visit. Not only does she claim that she should not have been questioned in the first place, she asserts that the interactions were excessively unpleasant, describing the tone struck by Defendant's employees as "inappropriate" and "loud." (Pl.'s Dep. 118:2–5 (Dkt. No. 41-2).) Furthermore, she describes Ms. Wolcott and Mr. Burnham as essentially accusing her of being a liar, and the entire transaction as creating the false impression that she was suspected of shoplifting. *Id.* at 213:9–11; 218:1–7. Finally, Plaintiff insinuates that the encounter was something tantamount to being detained. Defendant responds that its conduct was not sufficiently egregious to trigger liability under the tort of outrage.

The Court finds that there is no genuine issue of material fact as to whether Defendant's conduct met the requisite level of impropriety, even taking Plaintiff's account as true and drawing all inferences in her favor. No reasonable jury could find Defendant's conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. " *Dicomes*, 782 P.2d 1002, 1012 (Wash. 1989).

As an initial matter, making the inquiry, in itself, cannot constitute an intentional infliction of emotional distress in light of the Court's finding that Defendant was not even negligent in this regard. As for how they carried out the inquiry, it is clear that Defendant's employees did not believe Dilo functioned as a service animal. Taking Plaintiff's account as true, Ms. Wolcott and Mr. Burnham were impolite and confrontational. While this indicates that they believed Plaintiff was lying, Plaintiff acknowledges that they never called her a "liar." (Pl.'s Dep. 211:13–15 (Dkt. No. 41-2).) Similarly, Plaintiff asserts that the encounter created the false impression that she was suspected of shoplifting. Even if this is true, she also explicitly acknowledges that they never called her a "thief." *Id.* at 220:10–12. Finally, Plaintiff suggests in her briefing that Defendant's employees "detain[ed]" her for questioning. (*See, e.g.*, Pl.'s Resp. 17 (Dkt. No. 46).) However, Plaintiff concedes in her deposition that Ms. Wolcott and Mr. Burnham never said anything to indicate that she was not free to leave. (Pl.'s Dep. 212:11–14

ORDER – 14

1

2    (Dkt. No. 41-2).) While they were standing between her and the exit, she gives no indication that she

3    could not walk out at any time, as she ultimately did. *Id.* at 212: 21–25.

4        Clearly this was not an amicable encounter, and the Court takes Plaintiff at her word that it was

5    severely distressing to her. However Washington law requires a plaintiff to meet a high threshold to

6    succeed on a claim of outrage, and makes clear that "[c]onduct which is merely insulting or annoying, or

7    even threatening will not trigger liability." *Bryant*, 414 F. Supp. 2d at 1004. This is just such a case, and

8    therefore Plaintiff's outrage claim fails.

9    **F.    Washington Consumer Protection Act ("CPA") claim**

10       Plaintiff's fifth cause of action alleges violation of the Washington CPA. WASH. REV. CODE

11   §19.86.020 *et. seq*. The parties agree that the elements of a claim under the Washington Consumer

12   Protection Act were correctly set forth by the Washington Supreme Court in *Hangman Ridge Training*

13   *Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531 (Wash. 1986). This test requires, among other things,

14   that Plaintiff show injury to her "business or property." *Id*. at 535. In her deposition testimony, Plaintiff

15   unequivocally states that she is not claiming any harm to her business or property. (*See* Def.'s Mot. 16

16   (Dkt. No. 41-1).) In her response brief, Plaintiff confirms that damage to business or property is an

17   essential element of a CPA claim, however she asserts that it was satisfied in this case by injury to her

18   "daily shopping trade." (Pl.'s Resp. 24 (Dkt. No. 46-1).) In the absence of any authority that would

19   support this apparently novel theory of harm, Plaintiff's CPA claim fails as a matter of law.

20   **III.    CONCLUSION**

21       For the foregoing reasons, Defendant's motion for summary judgment (Dkt. No. 41-1) is hereby

22   GRANTED. Accordingly, Defendant's motions in limine (Dkt. No. 42), Plaintiff's response (Dkt. No.

23   45), and Defendant's reply (Dkt. No. 49) are moot and hereby STRICKEN.

24

25

26   ORDER – 15

SO ORDERED this 2nd day of October, 2007.


John C. Coughenour
U.S. District Judge

ORDER – 16